FILED

2020 May-27  PM 03:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

LYNN CLARK,                             )
                                        )
            Plaintiff                   )
                                        )
    vs.                                 )   Case No.  4:19-cv-01365-HNJ
                                        )
COMMISSIONER, SOCIAL SECURITY           )
ADMINISTRATION,                         )
                                        )
            Defendant                   )

## MEMORANDUM OPINION AND ORDER

Plaintiff Lynn Clark seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding her claim for supplemental security income and disability insurance benefits.  The undersigned carefully considered the record, and for the reasons expressed herein, the court **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.  The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment.

in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 416.905(a).  To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process.  *See* 20 C.F.R. § 416.920(a)(4).  The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity.  20 C.F.R. § 416.920(b).  Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at § 416.920(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 1.00–114.02. *Id.* at § 416.920(d).  If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. §§

2

416.920(a)(4)(iii), 416.925.  That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment.  *See Williams v. Astrue*, 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. § 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work.  20 C.F.R. § 416.920(e).  At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work.  *See id.* § 416.920(a)(4)(iv).  If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled.  *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work.  20 C.F.R. § 416.920(g).  If the claimant can perform other work, the evaluator will not find the claimant disabled.  *See id.* § 416.920(a)(4)(v); *see also* 20 C.F.R. § 416.920(g).  If the

claimant cannot perform other work, the evaluator will find the claimant disabled. 20 C.F.R. §§ 446.920(a)(4)(v), 416.920(g).

The court reviews the ALJ's "decision with deference to the factual findings and close scrutiny of the legal conclusions." *Parks ex rel. D.P. v. Comm'r, Soc. Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ. *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (citations omitted). Nonetheless, substantial evidence exists even if the evidence preponderates against the Commissioner's decision. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Ms. Clark, age 48 at the time of the ALJ hearing, protectively filed an application for disability insurance benefits on September 16, 2015, alleging disability as of January 1, 2007. (Tr. 32). Clark protectively filed an application for supplemental security

income on October 20, 2015, alleging disability as of January 1, 2007.[2]   (*Id.*)   The

Commissioner denied her claim, and Clark timely filed a request for a hearing.   (Tr.

352–90).   The Administrative Law Judge ("ALJ") held a hearing on December 4, 2017.

(Tr. 197–229).   The ALJ issued an opinion denying Clark's claim on May 22, 2018.   (Tr.

29–43).

Applying the five-step sequential process, the ALJ found at step one that Clark

had not engaged in substantial gainful activity since January 1, 2007, her alleged onset

date.   (Tr. 34).   At step two, the ALJ found Clark had the severe impairments of irritable

bowel   syndrome,   status   post   colectomy,   recurrent   herpes   zoster's,

depression/dysthymia, anxiety, migraines, and post-traumatic stress disorder (PTSD).

(Tr. 34–35).   At step three, the ALJ found that Clark's impairments, or combination of

impairments, did not meet or medically equal any impairment for presumptive disability

listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (Tr. 35–38).

---

[2] The record portrays discrepancies in Clark's application and alleged onset dates.   The ALJ stated that Clark applied for supplemental security income on September 16, 2015, and for disability insurance benefits on October 20, 2015.   (Tr. 32)   The ALJ further stated in both applications that Clark alleged her disability began on January 1, 2007.   (*Id.*)   However, Clark's "Application Summary for Disability Insurance Benefits" states that she applied for benefits on September 17, 2015, and alleged her disability began on September 10, 2015.   (Tr. 430).   Clark's "Application Summary for Supplemental Security Income" states that she applied for benefits on November 9, 2015, and alleged her disability began on January 1, 2007.   (Tr. 437).   Nonetheless, the application and alleged onset dates the ALJ perceived accord with those presented on Clark's Disability Determination Explanations:   the Disability Determination Explanation for her supplemental security income application states she applied for benefits on September 16, 2015, and alleged disability as of January 1, 2007, (tr. 342); the Disability Determination Explanation for her disability insurance benefits application states she applied for benefits on October 20, 2015, and alleged disability as of January 1, 2007.   (Tr. 352).   The dates the ALJ relied upon thus find some support in the record.   Furthermore, Clark does not challenge the dates the ALJ relied upon.   Accordingly, the court finds that any discrepancies in Clark's application and alleged onset dates remain harmless.

Next, the ALJ found that Clark exhibited the residual functional capacity ("RFC") to perform light unskilled work not requiring complex instructions or procedures. Clark could never climb ropes, ladders, or scaffolds; and, she could not work at unprotected heights or with hazardous machinery. She could occasionally stoop, crouch, or crawl. In addition, she could sustain no concentrated exposure to extreme heat or cold, and no concentrated exposure to dust, fumes, or other respiratory irritants. Furthermore, she would require reasonable access (on premises) to restroom facilities at the usual and customary breaks; she could sustain frequent interaction with co-workers and supervisors; and, she could have occasional contact with the general public. Finally, she could not work in direct sunlight. (Tr. 38).

At step four, the ALJ determined that Clark had no past relevant work. (Tr. 41). At step five, the ALJ determined that, considering Clark's age, education, work experience, and RFC, a significant number of other jobs exist in the national economy that she could perform. (Tr. 42–43). Accordingly, the ALJ determined that Clark has not suffered a disability, as defined by the Social Security Act, since January 1, 2007. (Tr. 43).

Clark timely requested review of the ALJ's decision. (Tr. 429). On May July 12, 2019, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision. (Tr. 1–4). On August 22, 2019, Clark filed her complaint with the court seeking review of the ALJ's decision. (Doc. 1).

## ANALYSIS

In this appeal, Clark argues substantial evidence does not support the ALJ's decision. Specifically, Clark avers (1) she did not effectively waive her right to counsel, and thus did not receive a full and fair hearing before the ALJ; (2) the ALJ failed to fully develop the record; and (3) the Appeals Council improperly failed to consider new evidence and improperly denied review of the ALJ's decision. For the reasons discussed herein, the court finds Clark's arguments do not warrant reversal.

### I.    Clark Validly Waived Her Right to Counsel, and Received a Full and Fair Hearing

Clark contends she did not receive a full and fair hearing because she did not knowingly and intelligently waive her right to counsel, and suffered prejudice as a result thereof. As discussed below, Clark's argument lacks merit because she plainly declined to exercise her right to counsel.

A claimant enjoys a waivable, statutory right to be represented by counsel at a hearing before an ALJ. *Hunter v. Soc. Sec. Admin, Comm'r*, 705 F. App'x 936, 942 (11th Cir. 2017). To validly waive his or her right to counsel, the claimant must effectuate the waiver knowingly and intelligently. *Smith v. Schweiker*, 677 F.2d 826, 828 (11th Cir. 1982). A claimant cannot knowingly and intelligently effectuate a waiver unless she "'is 'properly apprised of [her] options concerning representation[,]' . . . either in a

prehearing notice or at [the] hearing." *Id.* (quoting *Peppers v. Schweiker*, 654 F.2d 369, 371 (5th Cir. 1981)).[3]

Nonetheless, a claimant must demonstrate prejudice before a court may conclude the ALJ violated his or her due process rights to such an extent that the court must remand the case. *Pennington v. Comm'r of Soc. Sec.*, 652 F. App'x 862, 871 (11th Cir. 2016). To demonstrate prejudice, the claimant must show "the ALJ did not have all of the relevant evidence before him in the record . . ., or that the ALJ did not consider all of the evidence in the record in reaching his decision." *Id.* (quoting *Kelley v. Heckler*, 761 F.2d 1538, 1540 (11th Cir. 1985)).

On the day of her hearing before the ALJ, Clark signed a Waiver of Right to Representation form indicating she (1) could "read and understand" the form's substance;[4] (2) did not have any questions; (3) understood "the benefits and disadvantages of a representative"; (3) understood "how a representative would be paid"; and (4) "wish[ed] to proceed with the hearing . . . without representation." (Doc. 428). Upon commencing the hearing, the ALJ reminded Clark of her "one-time right to get a continuance, to get a representative or attorney to assist" her, and Clark confirmed that she wished proceed without representation. (Tr. 200). Furthermore,

---

[3] The Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions decided prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[4] The form described Clark's right to representation by an attorney; provided examples of how an attorney could assist Clark in her case; explained how Clark could obtain an attorney; and discussed how attorney's fees generally operate. (Tr. 428).

the Commissioner twice notified Clark of her right to representation prior to the hearing, including the provision of attorney's fees and attendant restrictions thereto. (Tr. 392, 395–96, 411–12).  Also prior to the hearing, the Commissioner provided Clark an information sheet containing the names, addresses, and telephone numbers of organizations offering pro bono legal services.  (Tr. 397).

Based upon the foregoing evidence, the court concludes Clark knowingly and intelligently waived her right to representation.  *See Hunter*, 705 F. App'x at 942 (the claimant validly waived her right to representation when, after receiving multiple notices regarding her right, she executed a written waiver thereof and directed the ALJ to proceed with the hearing); *Coven v. Comm'r of Soc. Sec.*, 384 F. App'x 949 (11th Cir. 2020) (per curiam) (the claimant validly waived her to representation upon executing a written waiver thereof after receiving three notices informing her of her right, and when the ALJ reminded her of her right and she indicated she wished to proceed without counsel); *McCloud v. Barnhart*, 166 F. App'x 410, 416 (11th Cir. 2006) (The claimant validly waived her right to representation because "[n]othing about her communication would have indicated that she did not understand the right to counsel or her waiver of that right.").   Furthermore, even if Clark did not validly waive her right to representation, the following discussion elaborates that she suffered no prejudice therefrom.

## II.    The ALJ Discharged His Duty to Develop a Full and Fair Record

Clark contends the ALJ failed to fully develop the record.  The relevant section heading in Clark's opening brief reads: "The ALJ Failed to Fully Develop the Record." (Doc. 12 at 24).  In the text following that heading, Clark stated:  "The ALJ failed to obtain the following records which were available at the time of the hearing."  (*Id.*) However, Clark did not identify the "records which were available at the time of the hearing", and proceeded only to cite case law for general principles governing an ALJ's duty to develop a full and fair record.

In her reply brief, Clark reasserted that "[t]he ALJ failed to obtain the following records which were available at the time of the hearing", though in the subsequent text she cited to records she submitted to the Appeals Council.  (Doc. 15 at 4).  To wit, Clark cited to records from Advanced Imaging, Advanced Medicine Plus Pediatrics, and Cherokee Pain Management.  (*Id.*)  In the following text, however, Clark again only cited to case law and thus did not actually explain how the ALJ failed to develop a full and fair record.

The court finds the ALJ satisfied his duty to develop a full and fair record.  The ALJ retains a basic duty to develop a full and fair record.  *Pennington*, F. App'x at 871. This basic obligation to develop the record ripens into a special duty when evaluating "an unrepresented claimant."  *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981) (quoting *Clark v. Schweiker*, 652 F.2d 399, 404 (5th Cir. 1981)).  Nevertheless, if a claimant waives his or her right to representation, "the special duty to develop the record does

not take effect." *Robinson v. Astrue*, 235 F. App'x 725, 727 (11ᵗʰ Cir. 2007) (per curiam) (citing *Brown v. Shalala*, 44 F.3d 931, 934 (11ᵗʰ Cir. 1995) (per curiam)).  In determining whether to remand a case for further development of the record, a court considers "whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." *Vangile v. Comm'r, Soc. Sec. Admin.*, 695 F. App'x 510, 512 (11ᵗʰ Cir. 2017) (quoting *Brown*, 44 F.3d at 935).

The record in this case evinces that the ALJ discharged his duty to develop a full and fair record.  Upon commencing the hearing, the ALJ identified the medical records comprising Clark's file.  (Tr. 201).  The ALJ then explained to Clark that "it's very important that we get all your medical records," (tr. 208), and asked Clark to provide a list of medical appointments not reflected in her file "to be sure we get the records." (Tr. 207–08).

In addition, the ALJ asked Clark to leave with him certain medical records she brought to the hearing to "help make sure we're ordering [the records] from the right place."  (Tr. 215).  The ALJ explained the importance of his submitting a sufficiently specific records request to ensure receipt of the proper records:  "[I]f we just send a generic request . . . and it doesn't specify where it goes to, it's going to come back and say they don't have any records."  (*Id.*)  The record portrays that the ALJ obtained treatment records from Riverview Regional Medical Center, the Kirklin Clinic of University of Alabama Hospital, Advanced Imaging, and Grace Counseling & Services, LLC.  (Tr. 1132–1305, 1312–16).  Finally, the ALJ ordered a consultative psychiatric

evaluation of Clark.[5]  (Tr. 208, 1306–11).  Clark does not identify any evidentiary gaps in her medical history or otherwise explain how the ALJ's alleged failure to develop the record prejudiced her.[6]  For these reasons, the ALJ satisfied his duty to fully and fairly develop the record.  *C.f. Brown*, 44 F.3d at 935 (the ALJ did not fully and fairly develop the record by failing to obtain medical records the claimant referenced during the hearing); *Ford v. Sec'y of Health & Human Servs.*, 659 F.2d 66, 69 (5th Cir. 1981) (by failing to order a consultative psychiatric examination despite evidence the claimant suffered a mental impairment, the ALJ failed to develop the record).

---

[5] Contrary to Clark's assertion that she "failed to attend" the consultative psychiatric examination, (doc. 12 at 23), the record portrays that Clark attended the examination on January 13, 2018.  (Tr. 1306–11).

[6] To be sure, after the ALJ issued his decision, Clark obtained counsel, who submitted the medical records Clark faults the ALJ for not securing.  The Appeals Council considered these records and determined they would not change the outcome.  Therefore, Clark suffered no prejudice because the record does not reveal evidentiary gaps, in light of the supplementation by her counsel, and the Commissioner properly considered these records during the appeal of the ALJ's decision, as discussed below.

Furthermore, although Clark contends these records "were available at the time of the hearing", (doc. 15 at 2), the new evidence submitted to the Appeals Council comprises only four records predating the December 4, 2017, hearing:  two Cherokee Pain Management records dated November 9, 2017, and November 16, 2017, (tr. 312–40); an August 15, 2018, Mental Health Source Statement from Licensed Independent Clinical Social Worker Renee Bellew; and a December 2, 2017, letter from Dr. Adam M. Alterman.  (Tr. 230).  However, Clark did not mention these records during the hearing. Because Clark "was in the best position to inform the ALJ as to her treatment history", including Bellew's Mental Health Source Statement and Dr. Alterman's letter, the ALJ did not err in failing to procure these records.  *McCloud v. Barnhart*, 166 F. App'x 410, 418 (11th Cir. 2006); *see Jones v. Comm'r of Soc. Sec.*, 695 F. App'x 495, 497 (11th Cir. 2017) (the ALJ did not err in failing to obtain medical records that the claimant never mentioned during the hearing).

### III. The Appeals Council Did Not Err in Failing to Consider New Evidence

Clark contends the Appeals Council improperly rejected treatment records submitted after the ALJ's decision – which both predate and postdate the ALJ's decision – and erred in concluding such evidence would not alter the administrative outcome.  In addition, Clark avers the Appeals Council inadequately explained its decision to deny review of her claim.  Because Clark's new treatment records raise no reasonable probability of negating the ALJ's findings, and the Appeals Council owes no duty upon denying review to discuss newly submitted evidence or elaborate why such evidence would not change the administrative outcome,  the court disagrees.

Generally, a claimant may present new evidence at each stage of the administrative process.  *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007) (citing 20 C.F.R. §404.900(b)).  The Appeals Council retains discretion to decline review of an ALJ's denial of benefits.  *See* 20 C.F.R. §§ 404.970(b), 416.1470(b) (2012). However, the Appeals Council must consider evidence that is (1) new, (2) material, and (3) chronologically relevant.  *Ingram*, 496 F.3d at 1261 (citing 20 C.F.R. § 404.970(b)).

New evidence is material if it is relevant and probative "so that there is a reasonable possibility that it would change the administrative result."  *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987) (citations omitted).  The evidence is chronologically relevant if it "relates to the period on or before the date of the [ALJ] hearing decision."

20 C.F.R. § 404.970(a)(5); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (holding that the Appeals Council must evaluate the entire record, including the new and material evidence submitted to it if it relates to the period on or before the date of the ALJ hearing decision).

When a claimant properly presents new evidence and the Appeals Council denies review, the Appeals Council need not "give a detailed rationale for why each piece of new evidence submitted to it does not change the ALJ's decision." *Mitchell v. Comm'r, Soc. Sec. Amin.*, 771 F.3d 780, 784 (11th Cir. 2014); *accord Beavers ex rel. J.W. v. Soc. Sec. Admin., Comm'r*, 601 F. App'x 818 (11th Cir. 2015) (pursuant to *Mitchell*, the Appeals Council need not discuss new evidence in denying a claimant's request for review of the ALJ's decision); *Burgin v. Comm'r of Soc. Sec.*, 420 F. App'x 901, 903 (11th Cir. 2011) (in denying review, the Appeals Council did not err in providing "no indication of the weight it gave to the newly submitted evidence or the legal standards it applied", or in failing to "discuss the impact of [the] evidence on [the] claims."). The court must consider whether the new evidence submitted to the Appeals Council renders the ALJ's decision erroneous by undermining the substantial evidence supporting the ALJ's decision. *See Mitchell*, 771 F.3d at 785.

### A. The Evidence Predating the ALJ's Decision Does Not Qualify As Material

The Appeals Council denied review in this case on July 12, 2019. (Tr. 1). As for the records predating the ALJ's opinion, the Appeals Council stated:

You submitted treatment records from the following: Advanced Imaging, . . . Advanced Medicine Plus Pediatrics, . . . Cherokee Pain Management, . . . Riverview Regional Medical Center, . . . a mental health statement from Renee Bellew, . . . and correspondence from Adam Alterman . . . . We find that this evidence does not show a reasonable probability that it would change the outcome of the decision. We did not exhibit this evidence.

(Tr. 2).

### 1. Advanced Medicine Plus Pediatrics Records

On March 7, 2018, Clark presented at Advanced Medicine Plus Pediatrics ("AMPP") as a new patient with Dr. Terry W. Perry. (Tr. 170). Clark reported that her anxiety/depression symptoms intensified in the evening, and that she experienced a worsened mood and increased anxiety. (Tr. 172). She denied suicidal ideations and problems maintaining relationships, though she reported that her symptoms interfered with household activities. (Id.) Clark further indicated that she experienced emotional lability and hypersensitivity; though she denied homicidal ideations, visual/auditory hallucinations, delusions, shortness of breath, crying spells, panic, and isolation. (Tr. 173). Dr. Perry's notes further read: "mood good; . . . sleeping well; appetite good; energy good; no apathy; maintaining functionality." (Tr. 173). In addition, Dr. Perry noted that Clark exhibited good judgment; normal mood and affect; and normal recent and remote memory. (Id.) Clark also appeared active; alert; and oriented to time, place, and person. (Id.)

Clark also reported "abdominal pain and frequent diarrhea but . . . no incontinence." (Id.) She exhibited increased bowel sounds, though her abdomen

remained "soft and non-distended", and displayed "no tenderness, guarding, masses, [or] rebound tenderness." (*Id.*)  Dr. Perry prescribed Clark buspirone for her "[m]ixed anxiety and depressive disorder" and dicyclomine for her "chronic diarrhea". (Tr. 174).

Clark returned to AMPP on March 15, 2018, for a follow-up appointment with Dr. Perry.  Clark reported that her anxiety/depression symptoms had improved, though they intensified in the evening and interfered with household activities. (Tr. 169).  She also reported experiencing emotional lability, high irritability, anxiety, and hypersensitivity. (*Id.*)  However, Clark denied homicidal ideations, visual/auditory hallucinations delusions, crying spells, panic, isolation, and apathy. (*Id.*)  Further, Dr. Perry indicated that Clark exhibited good judgment; normal mood and affect; and normal recent and remote memory. (*Id.*)  She also appeared active; alert; and oriented to time, place, and person. (*Id.*)

In addition, Clark reported experiencing abdominal pain, frequent diarrhea, muscle aches, and arthralgias/joint pain. (*Id.*)  However, Clark denied experiencing incontinence. (*Id.*)  Dr. Perry noted that Clark exhibited increased bowel sounds, though her abdomen displayed no tenderness, guarding, masses, or rebound tenderness. (Tr. 169–70).  Dr. Perry prescribed Clark doxycycline for her "[c]hronic obstructive lung disease"; various psychotropic medications for her "[m]ixed anxiety and depressive disorder"; and an antibiotic medication for her "chronic diarrhea." (Tr. 170).

Clark returned to AMPP on March 21, 2018, for another follow-up appointment with Dr. Perry.  Clark stated that she had recently gone to the emergency room and was

advised "to have [a] stress test." (Tr. 160).  Clark reported "chest pain on exertion", muscle aches, fatigue, and arthralgias/joint pain, though she denied "arm pain on exertion, . . . shortness of breath when walking, . . . shortness of breath when lying down, . . . palpitations, and . . . heart murmur." (Tr. 163).  Dr. Perry indicated that Clark's lungs exhibited "good air movement and decreased breath sounds", though she displayed no dyspnea,[7] wheezing, or rales/crackles. (Tr. 164).

In addition, Clark again reported that her anxiety/depression symptoms had improved, but remained worse in the evening and manifested emotional lability, anxiety, and hypersensitivity. (Tr. 163).  She reported that her symptoms did not interfere with her activities of daily living or ability to maintain relationships. (*Id.*)  Furthermore, Clark denied suicidal or homicidal ideations, visual/auditory hallucinations, delusions, crying spells, panic, isolation, and apathy. (*Id.*)  Dr. Perry noted that Clark exhibited good judgment; normal mood and affect; and normal recent and remote memory. (Tr. 164).  She also appeared active; alert; and oriented to time, place, and person. (*Id.*)  Furthermore, Clark denied experiencing abdominal pain or incontinence. (Tr. 163–64).  Dr. Perry noted that Clark exhibited increased bowel sounds, though her abdomen displayed no tenderness, guarding, masses, or rebound tenderness. (Tr. 164).

Clark returned to AMPP on April 4, 2018, for a follow-up appointment with Dr. Perry.  Dr. Perry's notes depict that he performed a pulmonary function test; however,

---

[7] Dyspnea typically refers to "shortness of breath, inability to take a deep breath, or chest tightness." https://www.ncbi.nlm.nih.gov/books/NBK357/ (last visited May 12, 2020).

his notes do not contain the results of the test and do not portray that Clark reported any complaints.  (Tr. 157–60).

On April 19, 2018, Clark presented at AMPP for a follow-up appointment with Dr. Perry.  Clark reported that she wished to increase one of her psychotropic medications.  (Tr. 152).  She reported that her anxiety/depression symptoms remained worse in the evening; interfered with household activities; and manifested emotional lability, high irritability, anxiety, hypersensitivity, and insomnia.  (Tr. 155).  However, Clark denied any inability to maintain relationships, suicidal or homicidal ideations, visual/auditory hallucinations, delusions, crying spells, panic, isolation, and apathy.  (*Id.*)  Furthermore, Dr. Perry noted that Clark exhibited good judgment; normal mood and affect; and normal recent and remote memory.  (Tr. 156).  She also presented as active; alert; and oriented to time, place, and person.  (*Id.*)

In addition, Clark reported experiencing muscle aches, fatigue, and arthralgias/joint pain, though she reported improvement in her "chest pain on exertion", "no arm pain on exertion, no shortness of breath when walking, no shortness of breath when lying down, no palpitations, and no known heart murmur."  (Tr. 155–56).  Clark denied experiencing abdominal pain or incontinence.  (Tr. 156).  Dr. Perry indicated that Clark's lungs exhibited decreased breath sounds, though she displayed no dyspnea, wheezing, rales/crackles, or rhonchi.  (*Id.*).  Dr. Perry also noted that Clark exhibited increased bowel sounds and epigastric tenderness, though she displayed no guarding, masses, or rebound tenderness.  (*Id.*)  Dr. Perry prescribed Clark medications

for her "[m]ixed anxiety and depressive disorder", and various medications for "[g]astroesophageal reflux disease", "[p]ersistent insomnia", "[i]rritable bowel syndrome"; and "[g]enital herpes simplex." (Tr. 156–57).

Clark returned to APMM on May 7, 2018, for a follow-up appointment with Dr. Perry.   Clark again complained of worsening anxiety/depression symptoms in the evening; interference with household activities and sleep; emotional lability; anxiety; hypersensitivity; and insomnia.  (Tr. 150).  However, she reported that she remained able to maintain relationships.  (*Id.*)  Furthermore, she denied suicidal or homicidal ideations, visual/auditory hallucinations, delusions, crying spells, panic, isolation, and apathy. (*Id.*)

Clark also complained of muscle aches, arthralgias/joint pain, fatigue, and back pain.  She scored her pain level at 8/10.  (*Id.*)  However, Clark reported "no chest pain, no arm pain on exertion, no shortness of breath when walking, shortness of breath when lying down, no palpitations, and no known heart murmur."  (*Id.*)  She also reported no abdominal pain or incontinence.  (*Id.*)

Dr. Perry again noted that Clark exhibited good judgment; normal mood and affect; and normal recent and remote memory.  (Tr. 151).  She also appeared active; alert; and oriented to time, place, and person.  (*Id.*)  Dr. Perry recorded no changes in Clark's lungs or abdomen from her April 19, 2018, appointment, and advised that she continue taking her previously prescribed medications.  (Tr. 151–52).

These records fail to undermine the substantial evidence supporting the ALJ's decision. The records portray that Clark consistently denied experiencing incontinence, and Dr. Perry routinely observed no abnormalities in Clark's psychiatric presentation. Similarly, Clark consistently denied suicidal or homicidal ideations, visual/auditory hallucinations, delusions, crying spells, panic, isolation, and apathy. Moreover, although Clark indicated that her anxiety/depression symptoms interfered with her activities of daily living, she consistently reported that she maintained functionality and relationships. Finally, the mere inclusion of diagnoses of gastroesophageal reflux disease and persistent insomnia, without more, does not establish disabling impairments.

The ALJ observed that Clark "has a long history of stomach issues and discomfort", and underwent various colon operations. (Tr. 40) (citing Tr. 655–755, 780–855, 966–1305). The ALJ correctly noted that Clark "occasionally reported more serious symptoms to her health providers." (Tr. 40); *see, e.g.*, tr. 731, 968, 970, 1012, 1039, 1043, 1045, 1298) (Clark variously complained of abdominal pain, nausea, or vomiting). However, the ALJ properly observed that Clark's treatment records portray "generally mild to moderate limitations." (Tr. 40); *see, e.g.*, Tr. 733, 737, 739, 781, 807, 819, 830, 966, 972, 1001, 1010, 1012, 1024, 1027, 1052, 1054, 1247, 1255, 1288 (Clark variously denied abdominal pain, diarrhea, nausea, vomiting, or incontinence, or exhibited an improvement in such symptoms).

In addition, the ALJ reviewed Clark's medical records in light of Listing 5.06 for inflammatory bowel disease.  The ALJ concluded Clark's impairment did not manifest consistently with:

[I]nflammatory bowel disease documented by endoscopy, biopsy, appropriate medically acceptable imaging, or operative findings with:

A. Obstruction of stenotic areas (not adhesions) in the small intestine or colon with proximal dilatation, confirmed by appropriate medically acceptable imaging or in surgery, requiring hospitalization for intestinal decompression or for surgery, and occurring on at least two occasions at least 60 days apart within a consecutive 6-month period; OR

B. Two of the following despite continuing treatment as prescribed and occurring within the same consecutive 6-month period:

1. Anemia with hemoglobin of less than 10.0 g/dL, present on at least two evaluations at least 60 days apart; or

2. Serum albumin of 3.0 g/dL or less, present on at least two evaluations at least 60 days apart; or

3. Clinically documented tender abdominal mass palpable on physical examination with abdominal pain or cramping that is not completely controlled by prescribed narcotic medication, present on at least two evaluations at least 60 days apart; or

4. Perineal disease with a draining abscess or fistula, with pain that is not completely controlled by prescribed narcotic medication, present on at least two evaluations at least 60 days apart; or

> 5. Involuntary weight loss of at least 10 percent from baseline, as computed in pounds, kilograms, or BMI, present on at least two evaluations at least 60 days apart; or
>
> 6. Need for supplemental daily enteral nutrition via a gastrostomy or daily parenteral nutrition via a central venous catheter.

(Tr. 35–36); *see* 20 C.F.R., pt. 404, subpt. P., App. 1, § 5.06.  Moreover, the ALJ limited Clark to only occasional stooping, crouching, and crawling; precluded her from climbing ropes, ladders, and scaffolds; and found that she requires reasonable access to restroom facilities.  (Tr. 38).

In addition, the ALJ that observed that Clark's treatment records portray, apart from an October 2015 hospitalization, that she generally controlled her psychiatric symptoms with medication and therapy.[8]  (Tr. 40).  Clark underwent electroconvulsive therapy "with excellent response" during her hospital stay, and Dr. J. Scott Wilson scored Clark's global assessment of functioning at 60 upon her discharge.  (Tr. 766).  Clark sought outpatient therapy treatment thereafter, during which her symptoms remained stable.  (Tr. 789, 887, 893, 906, 914).  Furthermore, as elaborated below, Clark's 2016 and 2017 treatment records portray that she routinely denied experiencing depression or anxiety; and that her physicians consistently noted that she displayed a normal affect and mood; appeared oriented to time, place, and person; and exhibited

---

[8] The record depicts that following her report of increased depression symptoms, (tr. 857–70, 879–82, 888–96), Clark was hospitalized in October 2015 "for recurrent major depression without psychosis and posttraumatic stress disorder."  (Tr. 764).

no unusual behavior.  (Tr. 1010, 1012, 1014, 1023, 1026, 1030, 1033, 1040, 1042, 1046, 1052, 1061, 1136, 1187, 1248, 1256, 1288, 1299, 1301).

Finally, the ALJ reviewed Clark's medical records in light of Listing 12.04 for depressive, bipolar, and related disorders; Listing 12.06 for anxiety and obsessive-compulsive disorders; and Listing 12.15 for trauma- and stressor-related disorders.  The ALJ concluded Clark's impairment did not manifest consistently with marked or extreme limitations in her ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself, as required in paragraph B; or with the achievement of only marginal adjustment despite diminished symptoms and signs, as required in paragraph C.  (Tr. 36–37).  Furthermore, the ALJ limited Clark to work requiring no complex instructions and only occasional contact with the general public.  (Tr. 38).

For these reasons, substantial evidence supports the ALJ's determination that Clark's impairments do not prevent employment, and the 2018 AMPP treatment records do not establish otherwise.

## 2.  Advanced Imaging Records

On March 15, 2018, Clark presented at Advanced Imaging upon complaining of chronic obstructive pulmonary disease.  (Tr. 119, 125).  Clark underwent x-rays of her chest, which portrayed "[c]hronic changes with minor hyperexpansion and DJD

[degenerative joint disease]"[9] and "[n]o additional focal or acute pathology." (Tr. 119). This record fails to displace the substantial evidence upon which the ALJ based his decision. The ALJ found that Clark's "history of . . . minimal degenerative joint disease" did not constitute a severe impairment, and made no findings as to Clark's alleged chronic obstructive pulmonary disease. (Tr. 35). The largely normal findings of Clark's March 15, 2018, chest x-rays do not undermine the ALJ's determination.

### 3. Cherokee Pain Management Records

Clark presented at Cherokee Pain Management ("CPP") on November 9, 2017, to apply "for entry into [the] pain management program." (Tr. 333). Clark returned to CPP on November 16, 2017, December 13, 2017, January 18, 2018, February 15, 2018, and May 8, 2018, to obtain prescription pain medication variously for stomach or abdominal pain, (tr. 292, 302, 307, 312, 321, 327), hip pain, (tr. 292, 302, 321, 327), rib pain, (tr. 307), joint pain (tr. 271, 312), and lower back pain. (Tr. 271). While these records depict Clark's various complaints of pain, they lack any medical assessments or treatment notations related to Clark's allegedly disabling impairments.

Relatedly, on March 25, 2018, Clark completed a series of SureMed Compliance questionnaires regarding histories of prescription drug use, substance abuse, depression,

---

[9] Hyperexpansion "occur[s] when air gets trapped in the lungs and causes them to overinflate." https://www.mayoclinic.org/diseases-conditions/emphysema/expert-answers/hyperinflated-lungs/faq-20058169 (last visited May 12, 2020).

opioid use, and pain.[10]  (Tr. 277–84).  Clark's responses in the depression questionnaire generated a score of 20/27, which, according to the questionnaire's scoring legend, corresponds to "severe" depression.  (Tr. 283).  However, like the afore-discussed CPP records, no medical assessments or treatment notations accompany this questionnaire.

Lacking any substantive, explanatory medical assessments, the foregoing records do not undermine the Appeals Council's determination that they would not change the administrative outcome.   *See Roberts v. Colvin*, No. 4:13-CV-0359-LSC, 2014 U.S. Dist. LEXIS 38250, at *20 (N.D. Ala. Mar. 24, 2014) (plaintiff's treatment records from appointments to obtain prescription pain medication refills engendered no reasonable possibility of changing the administrative outcome).

### 4.  Riverview Regional Medical Center Records

Clark presented at the Riverview Regional Medical Center emergency department on March 27, 2018, with complaints of headache and "chest pain/epigastric pain with severe nausea and diarrhea."  (Tr. 103).  Clark appeared anxious and displayed mild epigastric tenderness.  (Tr. 104).  She underwent chest x-rays, which displayed no abnormalities.  (Tr. 106–07).  Clark reporting "feeling much better" upon discharge. (Tr. 107).  This record does not displace the substantial evidence upon which the ALJ

---

[10] The court presumes Clark completed the questionnaires in association with her treatment at CPP, as SureMed Compliance provides "assessments and clinically meaningful intake questions . . . that score[] and categorize[] both the risk and benefit of the patient's [opioid] treatment." https://suremedcompliance.com/care-continuity-program (last visited May 12, 2020).

based his decision, as it fails to portray that Clark suffered an impairment precluding employment.

### 5.  Renee Bellew's Mental Health Source Statement

On August 15, 2018, Licensed Independent Clinical Social Worker Renee Bellew completed a Mental Health Source Statement regarding Clark's psychological symptoms. (Tr. 341).[11]  Bellew indicated that Clark can understand, remember, or carry out very short and simple instructions; and, she could interact with supervisors and/or co-workers. (*Id.*)  Bellew indicated that Clark cannot maintain attention, concentration, and/or pace for periods of at least two hours; perform activities within a schedule and be punctual within customary tolerances; sustain an ordinary routine without special supervision; adjust to routine and infrequent work changes; maintain socially appropriate behavior; or adhere to basic standards of neatness and cleanliness. (*Id.*)  In addition, Bellew indicated that Clark would remain off-task sixty percent of an eight-hour workday, and would fail to report to work fifteen days in a thirty-day period. (*Id.*)  Finally, Bellew noted that she could not "confirm or deny symptoms dating back to 2007." (*Id.*)

Bellew's Mental Health Source Statement does not displace the substantial evidence supporting the ALJ's decision.  First, Bellew's inability to opine as to whether

---

[11] Although Bellew's Mental Health Source Statement postdates the ALJ's decision, the Appeals Council considered it in conjunction with the new evidence predating the ALJ's decision and concluded it failed to "show a reasonable probability that it would change the outcome of the decision." (Tr. 2).

Clark's psychological symptoms date back to her alleged onset date buttresses the ALJ's finding that Clark does not suffer a disability.  *See Johnson v. Berryhill*, No. 4:18-cv-01013-JEO, 2019 U.S. Dist. LEXIS 123210, at *16 (N.D. Ala. July 24, 2019) (the Appeals Council did not err in denying review based upon a mental health source statement in which the physician failed to indicate the onset date of the claimant's symptoms).

Furthermore, Bellew's statements regarding Clark's limitations do not comport with the medical evidence of record.  As a preliminary matter, Bellew's assessment does not reference any of Clark's medical records or otherwise explain the bases for the statements therein.[12]  *See Harrison v. Comm'r of Soc. Sec.*, 569 F. App'x 874, 881 (11th Cir. 2014) (the Appeals Council did not err in denying review based upon a physician's conclusory opinion that contained no supporting explanation); *Quarles v. Barnhart*, No. 06-13663, 2006 U.S. App. LEXIS 29003, at *3 (11th Cir. Nov. 21, 2006) (a physician's opinion and assessments were entitled to minimal weight because they remained unaccompanied by any objective medical evidence).

Moreover, as aforenoted, Clark underwent successful electroconvulsive therapy during her October 2015 hospital stay and her symptoms remained stable throughout her outpatient therapy.  (Tr. 789, 887, 893, 906, 914).  Thereafter, Clark denied experiencing depression or anxiety during her 2016 and 2017 appointments with Dr.

---

[12] Notably, aside from her Mental Health Source Statement, the record contains only one other evidentiary item from Bellew:  A March 6, 2018, emotional support animal letter in which Bellew requests that Clark "be accompanied by her emotional support animal in the cabin of the aircraft." (Tr. 1316).

Vijayaprasad Tummala, (tr. 1010, 1012, 1014); her 2017 appointment with Dr. Angela Garrard, (tr. 1052); and her 2017 evaluation at the Kirklin Clinic. (Tr. 1299).

In addition, Dr. Adam M. Alterman routinely noted in his 2016 and 2017 treatment notes that Clark appeared well-groomed; oriented to time, place, and person; and, displayed an appropriate affect and a happy mood. (Tr. 1023, 1030, 1033, 1042). Dr. Alterman also described Clark's depression symptoms as moderate and stable, (tr. 1026); and, he consistently observed her as alert, oriented, and cooperative, with her cognitive function intact and "mood/affect full range." (Tr. 1040, 1042, 1046). Similarly, Clark's 2016 and 2017 Riverview Regional Medical Center records consistently note that she exhibited a normal mood and affect; normal behavior, judgment, and thought content; and appeared oriented to time, place, and person. (Tr. 1061, 1136, 1187, 1248, 1256, 1288, 1301).

Finally, Dr. Velda D. Pugh performed a consultative psychiatric examination of Clark on January 13, 2018, and described Clark's prognosis as "fair." (Tr. 1308). Dr. Pugh noted that Clark "would continue to benefit from treatment with antidepressants and psychotherapy." (*Id.*) She further observed that while Clark's affect was dysphoric, she remained "cooperative and alert during the interview" and "oriented to time, place and person." (Tr. 1308). Clark "did not exhibit any loose associations, tangential or

circumstantial thinking[,] [or] any confusion."  (*Id.*)  In addition, Dr. Pugh noted that Clark "functions in the average range of intellectual functioning."[13]  (*Id.*)

Considering the foregoing records, Bellew's Mental Health Source Statement lacks evidentiary support.  Accordingly, it fails to undermine the substantial evidence upon which the ALJ based his decision.

### 6.  Dr. Alterman's Letter

On December 2, 2017, Dr. Alterman penned a letter summarizing Clark's medical history and limitations vis-à-vis her irritable bowel syndrome and status post colectomy.  He wrote, in relevant part:

> After the surgery[,] . . . Clark's chronic constipation improved, however she now has fecal incontinence with frequent bouts of diarrhea, nausea, and abdominal pain.  This has continued until the present time with no improvement in symptoms despite interventions including multiple medications . . . , stool cultures to assess for possible infections, CT-scans, and laboratory blood work.
>
> . . .
>
> Clark's daily functions are severely limited by frequent bowel movements, up to 20-times daily, that may be sudden, urgent, without warning and sometimes result in fecal incontinence.  Her abdominal pain does not respond well to medication and often requires that she lay supine multiple times daily for extended periods of time.

---

[13] Dr. Pugh also indicated that Clark's symptoms would not affect her ability to understand, remember, and carry out instructions; interact with supervision, co-workers, and the public; respond to changes in the routine work setting; or concentrate, persist, and maintain pace. (Tr. 1309–10).  The ALJ found that these opinions manifested as "inconsistent with the great weight of the medical evidence of record, as well as [Clark's] history", and accorded them "little weight."  (Tr. 41).  In addition, the ALJ declined to give no more than "good weight" to Dr. Pugh's "overall opinions", "as [Clark] correctly noted some inaccuracies with [Dr. Pugh's] reports, though none of these are particularly dispositive relating to the overall findings."  (*Id.*)  Clark does not challenge the ALJ's weighing of Dr. Pugh's evaluation.

> Clark has suffered a 20 [pound] weight loss due to malabsorption and diarrhea since 2016. She has episodes of hypoglycemia (low blood-sugar), hypokalemia (low potassium) that require daily replacement of potassium, and has worsening depression.

(Tr. 230).

Dr. Alterman's opinion does not comport with the medical evidence of record, including his own treatment notes. *See Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2003) (a treating physician's opinion remains unentitled to controlling weight if (1) the evidence did not bolster the treating physician's opinion; (2) the evidence supported a contrary finding; or (3) a treating physician's opinion was conclusory or inconsistent with the doctor's own medical records). Dr. Alterman's treatment notes portray that Clark complained of abdominal pain, diarrhea, and nausea in February and March 2017, (tr. 1039, 1043, 1045). In addition, an April 19, 2017, record portrays that Clark telephoned Dr. Alterman's office complaining of "[p]ouchitis."[14] (Tr. 1050). However, this record does not depict that Clark spoke to Dr. Alterman or otherwise received medical treatment during the call. (*Id.*) Furthermore, Clark denied abdominal pain, diarrhea, and nausea in January, February, and May 2016. (Tr. 1024, 1026, 1027, 1035). Clark also complained of diarrhea but denied abdominal pain and nausea on April 15,

---

[14] Clark received a "j-pouch" during one of her colon surgeries, (tr. 205), which "allows [the patient] to eliminate waste normally after removal of [their] entire large intestine." https://www.mayoclinic.org/tests-procedures/j-pouch-surgery/about/pac-20385069 (last visited May 27, 2020). Pouchitis refers to "inflammation that occurs in the lining of a [j-]pouch." https://www.mayoclinic.org/diseases-conditions/pouchitis/symptoms-causes/syc-20361991 (last visited May 27, 2020).

2016, (tr. 1033); and on April 26, 2016, she denied experiencing abdominal pain, diarrhea, and nausea. (Tr. 1036).

Other physicians' records further undermine Dr. Alterman's opinion. According to Dr. Tummala's January 2012 treatment notes, Clark complained of constant, cramping abdominal pain that scored between 4/10 to 8/10. (Tr. 731). She stated she experienced an average of four to five bowel movements per day, though would experience up to fifteen bowel movements a day during "bad 'spells.'" (*Id.*) Clark presented at a follow-up appointment with Dr. Tummala in March 2012, where she reported constant abdominal pain but fewer bowel movements with an antibiotic medication. (Tr. 733). Dr. Tummala prescribed her medication for diarrhea. (*Id.*)

The medical evidence of record portrays that Clark did not complain of gastric symptoms again until 2016. According to Dr. Jason D. Ayres's treatment records, Clark denied nausea, vomiting, and diarrhea at her September and November 2014 appointments. (Tr. 737, 739). Similarly, Clark's 2015 Murfreesboro Medical Clinic records portray that she routinely denied abdominal pain, abdominal cramps, nausea, vomiting, and diarrhea. (Tr. 781, 807, 819).[15]

As for Clark's 2016 medical evidence of record, she complained of constipation and diarrhea at a September 2016 appointment with Dr. Tummala. (Tr. 1014).

---

[15] A June 2015 Murfreesboro Medical Clinic record states that Clark "was generally concerned about some food allergies in the context of irritable bowel-like symptoms to include diarrhea or constipation as well as upset stomach." (Tr. 805). However, according to the record's subsequent "Review of Symptoms", Clark denied abdominal pains, nausea, vomiting, diarrhea, constipation, and irregular bowel movements. (Tr. 807).

Similarly, she reported experiencing constipation "alternating with diarrhea" during a November 2016 follow-up appointment with Dr. Tummala. (Tr. 1012). However, Clark denied weight loss at both appointments. (Tr. 1012, 1014). In addition, according to a December 21, 2016, Riverview Regional Medical Center record, Clark reported abdominal pain, diarrhea, nausea, and vomiting, though she stated that her symptoms were "gradually improving." (Tr. 1060). Upon examination, Clark appeared well-developed and well-nourished. (*Id.*) Moreover, Clark denied recent weight change, nausea, vomiting, and chronic diarrhea during a December 29, 2016, examination by Dr. Charles L. Newman. (Tr. 972).

Dr. Newman's treatment notes further portray that Clark complained of chronic constipation in January 2017, (tr. 970), and experienced seven to ten bowel movements per day as of February 14, 2017. (Tr. 968). However, she denied recent weight change. (*Id.*) In addition, on February 23, 2017, Dr. Newman noted that Clark exhibited "some slowing of bowels[,] which is good." (Tr. 966). Furthermore, Clark denied significant weight change, abdominal pain, diarrhea, and nausea during her April and May 2017 appointments with Dr. Garrard. (Tr. 1051–522, 1054). Clark reported significant weight loss, chronic diarrhea, fecal incontinence, and chronic nausea during a September 2017 appointment at the Kirklin Clinic. (Tr. 1298). However, she denied abdominal pain, nausea, diarrhea, and vomiting during her July and November 2017 visits to Riverview Regional Medical Center. (Tr. 1247, 1255, 1288). In addition, she appeared well-developed and well-nourished at both visits. (Tr. 1248, 1288). Moreover,

32

Dr. Perry's 2018 treatment records portray that Clark consistently denied significant weight loss. (Tr. 134, 139, 145, 150, 155, 163, 169, 173).

Finally, Clark testified that on a typical day she takes her son to school, works on an online graduate course, tidies her house, and does yoga if she feels "up to it." (Tr. 217). Clark further testified that she goes grocery shopping and takes her son to taekwondo lessons multiple times a week. (Tr. 218). Furthermore, Clark stated in her Function Report that she vacuums, cleans the bathroom, washes dishes, and does laundry. (Tr. 529). In addition, she stated that she can walk approximately one mile without resting. (Tr. 532). She further indicated that although her impairments affected her ability to talk, remember, complete tasks, concentrate, understand, follow instructions, and get along with others, they did not affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, hear, see or, climb stairs. (Tr. 532).

The foregoing evidence fails to support Dr. Alterman's opinion that Clark's "daily functions are severely limited" by her gastric symptoms. While the record portrays that Clark intermittently complained of gastric symptoms, substantial evidence supports the ALJ's finding that Clark "generally has mild to moderate limitations arising from the combination of her physical and mental impairments." (Tr. 40). Furthermore, because Dr. Alterman's opinion does not accord with the medical evidence of record, there exists no reasonable probability it would meaningfully alter the ALJ's observation that Clark's physicians "did not opine that [she] was disabled or seriously limited due to

33

her impairments." (Tr. 40).   Accordingly,  Dr. Alterman's opinion does not displace

the substantial evidence supporting the ALJ's finding.

## B. The Evidence Postdating the ALJ's Decision Does Not Qualify as Chronologically Relevant or Material

In finding other newly submitted records chronologically irrelevant, the Appeals

Council stated:

> You also submitted records from the following:   Advanced
> Imaging, . . . Advanced Medicine Plus Pediatrics, . . . Cherokee Pain
> Management, . . . Riverview Regional Medical Center, . . . and Mercy
> Medical Clinic. . . . The Administrative Law Judge decided your case
> through May 22, 2018.   This additional evidence does not relate to the
> period at issue.   Therefore, it does not affect the decision about whether
> you were disabled beginning on or before May 22, 2018.

(Tr. 2).

### 1.   Advanced Imagining Records

On June 7, 2018, Clark presented at Advanced Imaging for x-rays of her lumbar

spine, thoracic spine, and left hip.   Her lumbar spine portrayed "[m]inimal lower facet

and [sacroiliac] joint [degenerative joint disease]." (Tr. 116).   The x-ray displayed "[n]o

additional focal or acute pathology otherwise." (*Id.*)   Clark's thoracic spine portrayed

"[m]inimal scoliosis" and degenerative joint disease, but "[n]o additional focal or acute

pathology otherwise."   (Tr. 117).   Clark's hip x-ray displayed "[m]inor sclerotic

acetabular changes with minimal subchondral cystic[16] changes on the left[;] [p]elvic

---

[16] Subchondral cysts constitute "sacs filled with fluid that form inside of joints such as knees, hips, and shoulders."   https://www.healthline.com/health/osteoarthritis/subchondral-bone-cyst  (last visited May 19, 2020).

floor phleboliths[;][17] [and] [m]inimal lower facet, [sacroiliac] joint, and symphyseal [degenerative joint disease]." (Tr. 118). The x-ray portrayed "[n]o additional focal hip joint, pelvic, or adjacent bony or soft tissue pathology otherwise." (*Id.*)

Clark returned to Advanced Imaging on June 28, 2018, for two magnetic resonance imaging ("MRI") tests of her spine. (Tr. 114). One MRI portrayed an "[a]pparent hemangioma[18] at the T8 level with minor kyphosis.[19]" (*Id.*) However, the remaining findings manifested as "[o]therwise generally unremarkable." (*Id.*) The second MRI portrayed "[m]inimal adipose changes . . . with degenerative disc changes at 5/1 including eccentric bulge or very shallow herniation on the left, narrowing the left lateral recess somewhat." (Tr. 115). The MRI also depicted "[d]egenerative disc signal change at 2/3 and borderline signal change at 4/5 . . . without significant height loss, bulging, or other compromise at these or any other levels." (*Id.*)

These records fail to depict that Clark suffered a debilitating impairment during the relevant time period, as they portray only minimal abnormalities in her hip and spine not exhibited in the medical evidence before the ALJ. Accordingly, these records lack

---

[17] Phleboliths constitute "tiny calcifications (masses of calcium) located within a vein" which "don't usually cause any problems or affect day-to-day life." https://www.healthline.com/health/pelvic-phleboliths (last visited May 19, 2020).

[18] A hemangioma constitutes "an abnormal buildup of blood vessels in the skin or internal organs." https://medlineplus.gov/ency/article/001459.htm (last visited May 12, 2020).

[19] Kyphosis "describe[s] the spinal curve that results in an abnormally rounded back." https://www.ncbi.nlm.nih.gov/pubmed/25050667 (last visited May 12, 2020).

chronological relevance and fail to undermine the substantial evidence supporting the ALJ's decision. *See Liggett v. Colvin*, NO. 2:12CV295-WKW, 2013 U.S. Dist. LEXIS 107361, at *33 (M.D. Ala. July 16, 2013) (the Appeals Council properly denied review based upon the plaintiff's x-ray reports because they portrayed minor abnormalities and failed to indicate such abnormalities "existed or caused any functional limitations before the ALJ's decision."), *report and recommendation adopted by Liggett v. Colvin*, NO. 2:12-CV-295-WKW, 2013 U.S. Dist. LEXIS 113183 (M.D. Ala. Aug. 12, 2013).

## 2. Advanced Medicine Plus Pediatrics Records

Clark presented at AMPP on June 7, 2018, for a follow-up appointment with Dr. Perry. Clark reported that her anxiety/depression symptoms remained worse in the evening, and that she experienced emotional lability, anxiety, hypersensitivity, and insomnia. (Tr. 145). However, Clark reported that her symptoms did "not interfere with activities of daily living" and she was "maintaining functionality." (*Id.*) She denied homicidal or suicidal ideations, visual/auditory hallucinations, delusions, crying spells, panic, isolation, and apathy; and, she reported she remained "able to maintain relationships." (*Id.*)

Dr. Perry's treatment notes further read: "[Clark] reports chest pain on exertion (better now) but reports no arm pain on exertion, no shortness of breath when walking, no shortness of breath when lying down, no palpitations, and no known heart murmur." (*Id.*) In addition, Clark reported fatigue, cough, muscle aches, arthralgias/join pain, and runny nose. Clark also reported restless sleep "but report[ed] no depression." Finally,

Clark denied muscle weakness, swelling in her extremities, abdominal pain, vomiting, and incontinence.  (*Id.*)

Upon examination, Clark exhibited good judgment, and normal mood and affect. She presented as active, alert, and oriented to time, place, and person.  She also displayed normal recent and remote memories.  (*Id.*)  In addition, Dr. Perry noted that Clark's abdomen exhibited increased bowel sounds and epigastric tenderness.  (Tr. 146).  He recommended, in relevant part, that she continue taking her prescription medications for "[m]ixed anxiety and depressive disorder", "[p]ersistent insomnia", and irritable bowel syndrome.  (*Id.*)

Clark returned to AMPP for a follow-up appointment with Dr. Perry on July 5, 2018.  Clark reported improvement in her anxiety/depression symptoms, though they remained worse in the evening and interfered with her household activities.  (Tr. 139). Clark reported emotional lability, high irritability, anxiety, hypersensitivity, and insomnia.  (*Id.*)  However, she denied suicidal and homicidal ideations, visual/auditory hallucinations, delusions, crying spells, panic, and isolation.  (*Id.*)  Moreover, and significantly, Clark reported that she maintained functionality.  (*Id.*)

Dr. Perry's treatment notes further read:  "[Clark] reports nose/sinus problems but reports no frequent nosebleeds.  She reports chest pain on exertion (better now) but reports no arm pain on exertion, no shortness of breath when walking, no shortness of breath when lying down, no palpitations, and no known heart murmur."  (Tr. 140). Clark also reported cough, muscle aches, arthralgias/joint pain, fatigue, restless sleep,

and runny nose. (*Id.*)  Clark denied muscle weakness, back pain, swelling in her extremities, abdominal pain, vomiting, and incontinence. (*Id.*)

Dr. Perry observed that Clark exhibited good judgment, and normal mood and affect.  She presented as active, alert; and oriented to time, place, and person.  She also displayed normal recent and remote memories. (*Id.*)  In addition, Dr. Perry noted that Clark exhibited increased bowel sound and epigastric tenderness. (*Id.*)  He again advised, in relevant part, that she continue taking her prescription medications for "[m]ixed anxiety and depressive disorder", "[p]ersistent insomnia", and irritable bowel syndrome. (*Id.*)

Clark returned to AMPP again on August 14, 2018, for a follow-up appointment with Dr. Perry.  Clark reported improvement in her anxiety/depression symptoms, though they remained worse in the evening. (Tr. 134).  Clark reported emotional lability, anxiety, hypersensitivity, and insomnia. (*Id.*)  However, she denied suicidal and homicidal ideations, visual/auditory hallucinations, delusions, crying spells, panic, and isolation. (*Id.*)  Clark also reported she maintained functionality and that her symptoms did not interfere with her activities of daily living. (*Id.*)

Dr. Perry's treatment notes further read:  "[Clark] reports chest pain on exertion (better now) but reports no arm pain on exertion, no shortness of breath when walking, no shortness of breath when lying down, no palpitations, and no known heart murmur." (*Id.*)  In addition, Clark reported fatigue, cough, muscle aches, arthralgias/joint pain, weakness, and numbness.  However, she denied swelling in her extremities, abdominal

pain, vomiting, and incontinence.  Dr. Perry observed that Clark exhibited good judgment, and normal mood and affect.  She presented as active, alert, and oriented to time, place, and person.  She also displayed normal recent and remote memories.  (*Id.*) In addition, Dr. Perry noted that Clark's abdomen exhibited increased bowel sounds and right upper quadrant tenderness.  (Tr. 135).  He recommended, in relevant part, that she continue taking her prescription medications for "[m]ixed anxiety and depressive disorder", "[p]ersistent insomnia", and irritable bowel syndrome.  (*Id.*)

These records fail to demonstrate that substantial evidence did not support the ALJ's decision.  As a preliminary matter, these records evince chronological irrelevance because they concern Clark's treatment subsequent to the ALJ's May 22, 2018, decision. The Eleventh Circuit recognized that "[m]edical examinations conducted after an ALJ's decision may still be chronologically relevant if they relate back to a time on or before the ALJ's decision."  *Hunter*, 705 F. App'x at 940 (citing *Washington v. Soc. Sec. Admin.*, 806 F.3d 1317, 1322–23) (11th Cir. 2015) (a psychologist's opinion postdating the ALJ's decision was chronologically relevant because it relied upon the claimant's symptoms and treatment records predating the ALJ's decision)).  This rule does not apply to the case at bar.

In this case, Clark's June and July 2018 AMPP treatment records do not "speak to [her] functioning during the period before the ALJ's decision."  *Hunter*, 705 F. App'x at 941.  These records do not reference or incorporate Clark's prior treatment records, but merely reflect Clark's various complaints as of June and July 2018.  Therefore,

revealing no new medical findings as to the severity of Clark's impairments prior to the ALJ's decision, these records do not relate back to the period on or before the ALJ's decision and fail to qualify as chronologically relevant. *See Hargress v. Soc. Sec. Admin, Comm'r*, 883 F.3d 1302, 1309–10 (11th Cir. 2018) (per curiam) (new medical records consisting of "medical providers' progress notes" and failing to indicate "the doctors considered [the claimant's past medical records" did not relate to the period before the ALJ's decision); *Stone v. Soc. Sec. Admin.*, 658 F. App'x 551, 553 (11th Cir. 2016) (per curiam) (medical records postdating the ALJ's decision did not qualify as chronologically relevant because they contained "no express reference" to the claimant's condition or treatment records predating the ALJ's decision); *Thornton v. Comm'r of Soc. Sec.*, 597 F. App'x 604, 615 (11th Cir. 2015) (per curiam) (a physician's evaluation of the claimant postdating the ALJ's decision manifested chronologically irrelevant because it simply described the claimant's "conduct, appearance, and behavior at the evaluation," and merely depicted, if anything, that [the claimant's] "condition had deteriorated since the ALJ issued his decision.").

Furthermore, even if considered chronologically relevant, the June and July 2018 AMPP treatment records do not qualify as material because there exists no reasonable possibility their consideration would change the ALJ's decision.  Like the treatment records the ALJ relied upon in his decision, the June and July 2018 AMPP records merely depict Clark's treatment for her psychiatric and gastric symptoms.  The records thus remain cumulative of the evidence the ALJ considered in assessing Clark's

impairments. *See Griffin v. Comm'r of Soc. Sec.*, 723 F. App'x 855, 859 (11th Cir. 2018) (per curiam) ("[T]he new [medical] report is cumulative to the extent that it is consistent with the previous medical records the ALJ already considered and thus, even if considered, it would not have changed the ALJ's decision); *Cash v. Comm'r of Soc. Sec.*, No. 4:16-cv-01635-JHE, 2018 U.S. Dist. LEXIS 47862, at \*10–11 (N.D. Ala. Mar. 23, 2018) (new medical records remained cumulative because they depicted the claimant's impairment in the precise manner depicted in the evidence before the ALJ). Substantial evidence supports the ALJ's determination that Clark does not suffer a disability, and the foregoing records fail to establish otherwise.

### 3. Cherokee Pain Management Records

On June 6, 2018, Clark presented at a follow-up appointment at Cherokee Pain Management complaining of aching pain in her lower back, hips, hands, and abdomen. (Tr. 261). Clark scored her pain level at 7/10 and rated her pain medications as "25% effective." (*Id.*) Dr. Dennis D. Doblar prescribed Clark an opioid pain medication. (Tr. 265).

Clark returned to Cherokee Pain Management for a follow-up appointment with Dr. Doblar on July 9, 2018. Clark complained of lower back pain traveling down both legs, and numbness, tingling, and weakness in her left leg. (Tr. 236). In addition, Clark reported aching pain in her lower back, hips, and stomach. (Tr. 251). She scored her pain level at 7/10 and rated her pain medications as "50% effective." (*Id.*) Dr. Doblar

conducted nerve conduction velocity and electromyography tests, which "revealed findings consistent with a motor-sensory polyneuropathy." (*Id.*)

Dr. Doblar also completed a Physical Capacities Evaluation Form on July 9, 2018.  He indicated that Clark could sit upright in a standard chair for less than thirty minutes at one time; stand for less than fifteen minutes at one time; and would spend three hours in an eight-hour period lying down, sleeping, or siting with her legs propped up at waist level or above.  (Tr. 255).  Dr. Doblar further noted that Clark would remain off-task twenty-five percent of an eight-hour day, and would fail to report to work twenty days in a thirty-day period.  (*Id.*)  In addition, Dr. Doblar indicated that Clark's limitations dated back to January 1, 2007, and would last at least twelve months.  (*Id.*)  Finally, Dr. Doblar noted that Clark's limitations manifested from degenerative joint disease, osteoarthritis, chronic obstructive pulmonary disease, colectomy, spinal bone spurs, kyphosis,[20] and scoliosis.  (*Id.*)

Dr. Doblar's records do not displace the substantial evidence supporting the ALJ's decision.  Dr. Doblar's June and July 2018 treatment notes postdate the ALJ's May 22, 2018, decision and fail to incorporate Clark's medical records pertaining to the relevant time period.  Likewise, his notes simply depict Clark's complaints of pain – in part for conditions which Clark does not contend preclude her employment – as of

---

[20]  Kyphosis refers to "an exaggerated, forward rounding of the back." https://www.mayoclinic.org/diseases-conditions/kyphosis/symptoms-causes/syc-20374205   (last visited May 19, 2020).

June and July 2018.  Accordingly, Dr. Doblar's June and July 2018 treatment records lack chronological relevance and materiality.   *See Hargress*, 883 F.3d at 1309–10; *Thornton*, 597 F. App'x at 615.

Likewise, there exists no reasonable probability that Dr. Doblar's Physical Capacities Evaluation Form would change the ALJ's findings.  First, Dr. Doblar's July 9, 2018, assessment does not relate back to a time on or before the ALJ's May 22, 2018, decision.  Dr. Doblar's assessment fails to portray that he reviewed or relied upon any of his or other physicians' treatment records pertaining to the time before the ALJ's decision.  In addition, Dr. Doblar provided no evidentiary support for his assessment of Clark's ability to sit and stand, or his opinions that Clark would be off-task twenty-five percent of an eight-hour workday; that she would fail to report to work twenty days in a thirty-day period; and that her limitations dated back to January 1, 2017, and would last at least twelve months.  Accordingly, Dr. Doblar's Physical Capacities Evaluation Form manifests as chronologically irrelevant.   *See Hunter*, 705 F. App'x at 940 (A physician's evaluation retained chronological relevance, despite postdating the ALJ's decision, because the physician "reviewed [the claimant's] medical records from the period before the ALJ's decision" and explicitly opined that the opinion dated back to the date of the ALJ's decision.); *Washington*, 806 F.3d at 1322 (a physician's opinion postdating the ALJ's decision manifested as chronologically relevant because it incorporated the claimant's symptoms dating back to the period before the date of the

ALJ's decision); *see also Harrison*, 569 F. App'x at 881; *Quarles*, 2006 U.S. App. LEXIS 29003, at *3.

Relatedly, as elaborated above, Dr. Doblar opined that Clark's limitations arose from degenerative joint disease, osteoarthritis, chronic obstructive pulmonary disease, colectomy, spinal bone spurs, kyphosis, and scoliosis. However, excepting osteoarthritis, Dr. Doblar's treatment notes fail to portray that he ever diagnosed her with any of the conditions he averred causes her limitations. (Tr. 327). Furthermore, and significantly, excepting chronic obstructive pulmonary disease and her colectomy, none of these conditions constitutes an impairment Clark claims to be disabling. Indeed, Clark enrolled in Dr. Doblar's "pain management program" for treatment vis-à-vis her alleged stomach, joint, hand, and back pain. (Tr. 231–340). Although Clark complained of rib pain at her December 13, 2017, follow-up appointment, Dr. Doblar's treatment notes fail to indicate that they ever discussed her alleged chronic obstructive pulmonary disease.

Moreover, Dr. Doblar's treatment records depict that Clark frequently denied requiring "any assistance with activities with daily living.", (tr. 293, 303, 313); or indicated she required such assistance only vis-à-vis housework, (tr. 308); or only "occ[asionally]", "sometimes", or "lately" required such assistance. (Tr. 232, 252, 262, 272). Clark's minimal need for assistance with activities of daily living further undermines Dr. Doblar's assessment of the severity of her limitations.

Finally, Dr. Doblar's opinions regarding Clark's ability to work invades the province of the ALJ and sustain no dispositive weight.

> According to 20 C.F.R. § 404.1527(d), the determination of whether an individual is disabled is reserved to the Commissioner, and no special significance will be given to an opinion on issues reserved to the Commissioner. Section (d)(2) provides that although the Commissioner will consider opinions from medical sources on issues such as the RFC and the application of vocational factors, the final responsibility for deciding those issues is reserved to the Commissioner.

*Pate v. Comm'r, Soc. Sec. Admin.*, 678 F. App'x 833, 834 (11th Cir. 2017). That is, "the task of determining a claimant's . . . ability to work is within the province of the ALJ, not of doctors." *Robinson v. Astrue*, 365 F. App'x 993, 999 (11th Cir. 2010).

Based upon this review, Dr. Doblar's treatment records, including his Physical Capacities Evaluation Form, fail to engender a reasonable probability that they would change the administrative outcome.[21]

### 4.  Riverview Regional Medical Center Records

Clark presented at the Riverview Regional Medical Center emergency department on August 25, 2018, with complaints of pain "from her chest down to her abdomen that is worse with breathing." (Tr. 61). Clark appeared alert, and oriented to

---

[21] The court notes that Clark completed a "Depression Inventory" questionnaire during her July 9, 2018, appointment with Dr. Doblar. (Tr. 249). The questionnaire depicts that Clark's responses generated a score of "17"; however, the questionnaire lacks a scoring legend or any similar guidance as to the significance of this number. Accordingly, the court concludes this questionnaire fails to evince a reasonable probability it would change the ALJ's findings as to her mental impairments. *See Beavers v. Soc. Sec. Admin.*, 601 F. App'x 818, 823 (11th Cir. 2015) (the Appeals Council did not err in denying review based upon a questionnaire that did not define its nomenclature or explain how its terms corresponded to the Regulations).

time, place, and person.  (Tr. 63).   X-rays of her chest revealed a normal heart size, normal pulmonary vasculature, and "no change" since her March 17, 2018, visit to the hospital.  (Tr. 64).  Clark's lungs displayed mild hyperinflation, though they appeared "clear."  (*Id.*)  X-rays of Clark's chest portrayed a normal gas pattern without evidence of obstruction, free air, or mass effect.  Her pelvis portrayed multiple phleboliths.  The treating physician administered Clark "IV fluid and IV dye load", after which she reported feeling better.  (Tr. 65).  Clark also received a prescription for an inhaler upon her discharge.  (Tr. 86).

These hospital records fail to evince that substantial evidence did not support the ALJ's decision, as they do not speak to Clark's limitations during the relevant time period.  Rather, Clark's August 25, 2018, visit to Riverview Regional Medical Center simply depicts her complaints of chest pain as of that date.  Accordingly, this record does not manifest as chronologically relevant to the ALJ's assessment of her disability.

### 5.  Mercy Medical Clinic Records

Clark presented at Mercy Medical Clinic on January 30, 2019, complaining of "bipolar" and "sensorimotor polyneuropathy."  (Tr. 13).  Clark reported experiencing moderate, daily mood swings; depression; irritability; and anxiety.  (*Id.*)  Upon examination by Dr. Jane Teschner, however, she appeared alert and oriented; interacted appropriately; displayed an appropriate mood and affect, and did not exhibit any unusual behavior.  (Tr. 14).  Clark also reported experiencing cough, shortness of breath, wheezing, abdominal pain, constipation, diarrhea, heartburn, nausea, vomiting,

joint pain, muscle pain, leg swelling, headaches, dizziness, difficulty walking, numbness, and tingling. (*Id.*) Dr. Teschner assessed Clark with "[b]ipolar disorder, current episode mixed, severe, without psychotic features"; polyneuropathy, unspecified; pain in unspecified joint; fibromyalgia; and opioid dependence, uncomplicated. (Tr. 15). Dr. Teschner prescribed Clark various psychotropic medications and an anti-inflammatory medication. (Tr. 16).

Clark returned to Mercy Medical Clinic on January 31, 2019, to seek suboxone treatment therapy. Dr. Teschner prescribed her medication to treat her opioid dependence. (Tr. 19).

Clark's Mercy Medical Clinic records do not displace the substantial evidence supporting the ALJ's decision. These records lack chronological relevance, as they postdate the ALJ's decision and do not speak to the source or severity of Clark's impairments during the period before the ALJ's decision. Moreover, they depict Clark's complaints for impairments apart from those she claims preclude employment. Accordingly, these records evince no reasonable possibility of negating the ALJ's findings.

In sum, the new treatment records predating and postdating the ALJ's decision which Clark submitted to the Appeals Council provide no additional evidence that she suffered a vocationally restrictive disability. Therefore, the Appeals Council did not err in denying Clark's request for review of the ALJ's decision.

Finally, the court rejects Clark's argument that the ALJ "must show in its written denial that it adequately reviewed the new evidence." (Doc. 12 at 35). As elaborated above, the Appeals Council owes no duty upon denying review to discuss newly submitted evidence or elaborate why such evidence would not change the administrative outcome. *See Mitchell*, 771 F.3d at 784; *Beavers*, 601 F. App'x 818; *Burgin*, 420 F. App'x at 903. Here, therefore, the Appeals Council did not need to give a more detailed explanation or to address each piece of new evidence individually. *See White v. Comm'r of Soc. Sec. Admin.*, No. 4:16-cv-00248-JHE, 2017 WL 4246895, at *4 (N.D. Ala. Sept. 25, 2017) (finding the Appeals Council's explanation that "new information is about a later time" sufficiently established that the Appeals Council considered the substance of new the records); *Zanders v. Berryhill*, No. CA 16-0542-MU, 2017 WL 3710790, at *14 (S.D. Ala. Aug. 28, 2017) (the Appeals Council's statement that it reviewed new evidence and concluded it related to "a later time" was sufficiently directed to materiality and/or chronological relevance, and did not amount to an inadequate or perfunctory evaluation of the evidence) (citing *Mitchell*, 771 F.3d at 784–85; *Beavers*, 601 F. App'x at 822). Accordingly, the Appeals Council's consideration of Clark's new evidence and ultimate denial of her request for review do not manifest as improper.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision.

**DONE** this 27th day of May, 2020.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE